Take your time in getting set up, but let me go ahead and call the second case, number 17-15364. Johan Calixto v. Hadylle Lesmes. Ms. Skillett, whenever you're ready to start. Can you hear me? My name is Carmen Gillette, and I'm an attorney from Sarasota, Florida. With me today is an associate from my office, Attorney Shanna Hurrahan. My client is in the gallery. I represent Mr. Johan Sebastian Calixto, and at counsel table is Representative Robert Ehrenstein, an attorney from New York and Florida representing the Hague Committee of the International Academy of Family Lawyers. Your Honors, we're here today requesting that you reverse the trial court's ruling which found that the United States was the habitual residence of the minor child, M-A-Y. We are asserting that Columbia is, was, and always has been the habitual residence of this child. We are also asking that you consider that your review today would be on a de novo basis, and that would be because the crux of this case was the ultimate determination by the trial court that the United States was the habitual residence. Isn't that, it's not purely a question of law. Well, your review would be a mixed question of law and fact. You would apply a clearly erroneous standard to the findings of fact, and then the court's application of the convention to the ultimate determination that the United States was the habitual residence would be a de novo review. I have a question for you. I didn't see it in the report and recommendations or the court's order, but I may have missed it. Did the court make a finding of fact with respect to whether Mr. Calixto's consent was conditional? Well, it was interesting. She actually made, under her findings, she never made that particular statement, but if you look at her findings of fact, I counted no less than five findings where the court found that Mr. Calixto at least subjectively believed that the condition was that they were going to live as a family in the United States. No less than five. So I guess my question for you is, did the court ever say either that his consent was conditional or that his consent was not conditional? Those words were not articulated in the order, and I think I brought that up actually in my brief, that there were findings that this was his condition, but the court didn't reach the ultimate. So that leads me to the next question, which is, I mean, I feel like maybe we need a finding of fact on that issue, and we are not equipped as an appeals court to make findings of fact. If we need a finding of fact on that issue, is there any reason we shouldn't remand it to the district court to make a finding of fact on that issue? Because it seems to me like it might affect the overall analysis. I think that is one way that this court could address it, but I think the court has the jurisdiction to make a de novo review of what the court did relating to her ultimate finding that the U.S. was the habitual residence by her application of the convention, and if I might go into that a little bit, what it looks like, and the trial court cited Fuentes, which is out of the 11th Circuit. I'm not sure why she cited Fuentes. It has a completely different factual pattern, and actually I dug up the evidence in Fuentes, and the travel document in that case was an indefinite travel document. There was no hard return date on that case, and it involved a child born, other places. It's not on all fours with ours, but what it appears she did was she took Fuentes for the proposition that I'm going to look to the time period prior to the wrongful removal or retention, and I'm going to look at the time frame after the rightful removal, which was November of 2015, and I'm going to look to 2015 of November to 2016 of November 2016, and I'm going to look at that time frame and determine what the habitual residence was during that time frame. That's what she took Fuentes to mean, but what that actually does is that takes the time frame she's looking at to determine habitual residence and superimposes it over the time of dissent, so she actually brackets off the words in Article 3, but you can't do that. You've got to say, what was the habitual residence at the time these parties last shared a mutual intent to change the habitual residence and abandon the old residence? That's why I'm asking the question I'm asking, right? When was the last time they shared a mutual intent? And so then the question is, what was the mutual intent that they shared? Was it an intent for the child unconditionally to come to the United States, or was it an intent that was conditional, or was there never a shared intent because one parent intended to bring the child to the United States permanently, and the other parent, you know, understood that it was conditioned on his joining them? That's what I'm trying to figure out. Did the district court make a factual finding on that issue? The district court did not make a factual finding articulating what the condition was, who believed the condition, et cetera. Made findings of fact relating to the petitioner's subjective intent. I will state that the Appelese answer brief on page six, though, does make a statement and admission that the parties agreed that they were to come together and live as an intact family. I believe the court has the power to look at the court's application of the convention and the laws relating to how she determines habitual residence. Right, but I guess I'm sort of asking maybe, and I'm not asking it clearly, so I apologize. Let me try again. It's a more nuanced question, which I guess is, did, was there a finding of fact about whether the father wanted the daughter to live in the United States permanently, regardless of whether he was able to join her? I would say that there is no particular finding of fact in that regard, but the record below surely supports that he did not want the child living without him. I mean, in fact, the judge uses his words about a new beginning for the family. Right, but so there's no finding of fact, then, on whether the father ever had, as fleeting as it may have been, the intent for his daughter to live in the United States, regardless of whether he was ultimately able to join them. Not addressed in that way, no. Do you think the concepts of conditional consent and conditional intent are different? Because there's no doubt that he conditionally consented to having her come to the US for a limited period of time, right? That's undisputed in the record. No, it was a rightful removal. Right, so it's undisputed that at the time that the mother took the child, he agreed with a return date in anticipation. Yes, sir. Right, that's undisputed. That is undisputed. Right, so the question is, as I think Judge Rosenbaum was trying to get at, is what are we to draw, or what is a court to draw from the record with regard to the question of shared intent? Because shared intent is a factual finding, right? Shared intent is a factual finding. So the question is, what are we supposed to do with this record on that issue if the district court didn't expressly make findings on what that shared intent was, and whether or not that shared intent, at least on the part of one or both, was conditional? Well- We're not, we don't have the parties in front of us. We can't ask questions. We don't have the lawyers cross-examining or presenting evidence. And so, if we believe that we need an explicit factual finding on shared intent. Is that an appropriate basis on which to remand? That is an appropriate basis on which to remand. All right, now let me ask you this, a question that cuts in part against your position, although I don't think it's necessarily determinative, on the issue of that shared intent. There is evidence in the record that at some point before the supposed return date, the mother tells the father, listen, the only way you can come here is if I help you and we get married, and we're not getting married because we're not a couple anymore. At that point in time, what does that say about the shared intent? Because some of those statements were presumably made before the rightful removal. If those statements were made before the rightful removal, and the father lets the mother go with the child, knowing that the mother is on record saying, the only way I can help you is if we get married, and we're not getting married because we're not a couple anymore, what does that do to the whole question of shared intent? Well, there was additional evidence in the record that she returned after those supposed statements. I believe you're referring to August of 2015. Right before the trip with the child, yes. Correct. But when she returned to Columbia in October of 2015, there's evidence in the record that her actions were inconsistent with statements that she may have made to the petitioner, my client, in August. And also, I might add that my client has less than a high school education and doesn't know immigration law. And I will add that it's important, if you look at the answer brief, that they admit on page six also again, that my client, in fact, at the time that the child was leaving to come back to the United States, had applied for, and he signed the consent in November, I think, 24th of 2015. At that time, he had just applied for a tourist visa. But he hadn't heard back, because that was going to take several months to hear back. And he didn't know if he was going to be able to get a visa. But he took actions consistent with going to the United States, subsequent to the statements your Honor's referring to. So I think his actions that are confirmed in the record and also in the answer brief, support that his intent was always to travel to the United States as a family. And furthermore, the other findings in the record about the fact that he had shared his custodial access up until the time of the proceedings, 50-50, in fact, raising the child in Columbia while the respondent was in the United States. Most of the child's three and a half years before the child came to Florida, his actions in acting as the father would be totally inconsistent with signing a consent to let the child move to the United States on a permanent basis knowing he would never see the child again. Or thinking he would never see the child again. So- Well, I understand that there's substantial dispute about the value of a tourist visa. Isn't that a kind of a temporary thing? That doesn't mean you can stay forever, does it? I know that a lot of people do, but that's not supposed to, is it? No, I am not an immigration lawyer. My understanding is that on a tourist visa, you can stay originally maybe six months at a time and get one or two extensions on that. So how does this applying for a tourist visa change the fact that he really wanted to come here to stay with the family? How does it support that? I think he- Probably doesn't. Well, he was attempting to come to the United States, and perhaps those statements had been made that she was not going to marry him. They were engaged at one point. I mean, I can't go back in and recreate the record at this point. But I think the record is just full of findings of fact that are in the record about his intent to stay as a family and to travel as a family and live as a family. My point being that his applying for a tourist visa seems to imply that his intent at that point was to come visit and visit with his daughter and her mother, but then go back to his country. Isn't that more believable than that that means that he intended to come and stay with them? I think what's believable is that at that point in time, perhaps that was his way of trying to travel with the family. But the respondent made a contract with the petitioner and with the Colombian immigration authorities that this child would be returned on November 24th of 2016, and she failed to honor that. And we believe that the Colombian contracting state has a legitimate interest in having these travel consents, travel forms, immigration documents, whatever you want to call them, honored. And our position would be that there were two conditions. One, that the child would be returned no later than November of 2016. And two, as the court found, that there would be a reunification of the family in the state of Florida. So it actually had two conditions precedent. And the fact that she refused to return the child in November of 2016 violated the condition. The condition never occurred. So our argument is that the consent fails, as if the contract between the parties never existed. The second condition was that they come as a family, and that never occurred. And frankly put, the respondent took the position with our Department of State that she never intended to return to Columbia and wasn't going to return to Columbia. And that's in the record, the letter. And wasn't going to participate in any proceedings that might allow my client to see his child. And signing that consent form in November of 2015 was what precipitated my client being away from his child for two years. All right, Ms. Shilla, thank you very much. We'll give you your full time for rebuttal. Thank you. Ms. Crack. Please support Kathleen Crack of Shots and Bowen appearing pro bono on behalf of Appalachian mother Hedigi Lesmeth. Cutting to the chase, as framed by the father's brief, he challenges the trial court's legal conclusion regarding habitual residence. But the backbone of that argument is that he challenges the trial court's factual findings regarding shared intent. And as this court's aware, in order to establish a prima facie case, you must show first and foremost that the child was removed from their country of habitual residence. And the trial court concluded that the petitioner failed to establish that. I'm sorry, let me just interrupt you for one second. Because you just said, and I think you're right, that the backbone of the decision turns on shared intent, right? Well, to clarify, that's one of the factors to be considered under a habitual residence analysis. But yes, the backbone of the father's argument is, he says that it was a conditional agreement for the child to relocate to the United States to habitually reside as a US permanent resident. I'm sorry. The backbone of that, what I was saying was, is under the habitual residence analysis, you are under the habitual residence analysis, there are three factors. First of all, the existence or nonexistence of shared intent, geographic change, and acclimation. The backbone of the father's argument is focusing on the factual finding by the trial court regarding shared intent. And so my question for you is the same as I had for opposing counsel. And that is, what findings of fact did the district court make about the couple's shared intent about where the child should permanently reside? The trial court made a finding of fact that the couple's last shared intent was for the child to relocate to the United States. Permanently or, that's the question, right? I agree that the trial court found that at some point they shared the intent for the child to go to the United States. The question is whether they ever shared an intent for the child to reside there permanently, regardless of whether the father was going to be able to join them. Well, and then the question becomes whether or not a conditional agreement to relocate a child is something which forecloses the trial court from looking at all the other factors that are to be examined. And in this case, with regards to that- Well, before you get to that, can you answer my question? Did the trial court make such a finding? She made a finding that even if the father's version of events was credited, which she did not specifically credit in her order, that there was still a finding that the last shared intent was for the child to relocate to the United States. And, well, again, to relocate to the United States permanently or, because I think we can all agree that there was a shared intent for the child to relocate to the United States for a year. But that's not the question. The question is whether there was a shared intent ever for the child to relocate to the United States permanently, regardless of whether the father came. They don't, they and the court decisions don't count it in terms of whether it's to relocate permanently, so much as it is to relocate for the purpose of habitually residing in the new forum. So the trial court looked at it and said, look, I'm getting two different versions of events. The father has his version of event where it's not a matter that there was a condition placed before, but he's relying upon a consent form executed immediately prior to the child's departure. And under his version- But the consent form, he could have filled in with any period of time, and he chose one year. Correct, he did. The issue, though, or one of the several issues in this one is that the father is effectively arguing to make the travel consent form dispositive. And to foreclose looking at the rest of the objective evidence. And in this case, that objective evidence included testimony which refuted the father's version of events, that they were this happy together couple. There, in addition to the respondent, there were witnesses that also testified to the fact that they had broken up. The importance of that to Judge Martinez's comment was that prior to the mother leaving with the child in November of 2015, she had relayed that they had broken up. So the judge was- Well, my understanding of the magistrate judge's findings was the mother also acknowledged that she had entered into a new relationship in Florida in October 2015 before she returned to Columbia to collect the child. And that she had concealed that relationship from the father. When the father heard this testimony, he stated that if he had known of the mother's new relationship in November 2015, he never would have signed the consent allowing the child to go to the United States. Right, and I would take you back to the fact that the mother testified and other witnesses corroborated that she had broken up with the respondent. And there is without a doubt, no doubt, that the father was of the mindset that they weren't broken up until he said they were broken up. But the fact is, whether or not she had another relationship, she communicated that they were no longer together as a couple. And separate and apart from that, she still wanted to continue the relationship between the child and the father. And the record is replete with evidence that she did that to include regular daily video phone in the whole nine yards. So contrary to the allegations in the petition filed by the father, where the mother had supposedly cut off his only means of communication, the evidence showed the exact opposite. And so you have the trial court having to weigh the credibility and the different version of events presented by the father who presented a happy unified front. As compared to the respondent's testimony supported by that of other witnesses that confirmed they had in fact broken up prior to the mother leaving with the child. In addition to that, did the trial court make a finding on whether, in fact, that was the case, that they had broken up, in fact, and that the father knew they were broken up? I'm aware that there was testimony about that, but it was also from, I mean, the question is whether there's a finding of fact on that. Did the trial court find these witnesses to be credible and credit their testimony over the father's testimony in this respect? I don't know that the trial court would be required to make a finding of fact. Well, I think it would. I mean, how do we know what the decision is based on? You see, the problem is, in order for us to be able to review the decision and the analysis, we need to know what facts the trial court was basing its decision on. You might be right, the trial court may ultimately have concluded these things, but if it didn't say so, we don't know whether the trial court's decision was based on these things. We have no idea. But when you look at the trial court's decision, she specifically states in the report and recommendation that was approved by the district court that even if she credited the father's version of effects, i.e. did not credit the father's version of events that the child's removal was conditioned upon him also joining, that there was still a finding of last shared intent, and in addition to shared intent, this court has made it abundantly clear that that is but one factor to be considered when analyzing habitual residence. So even if you were to find that there had not been a specific finding on shared intent, this court has made clear that with or without shared intent, that's not dispositive. And the crux of their argument is that it should be dispositive. He says that it was conditional. What other facts do you think would substitute for a finding on shared intent? Well, she did make a finding on shared intent. I know, but that's not your argument. No, my argument is that- That you're saying that even if there wasn't a finding on shared intent, we could affirm. And I'm asking you, what other factors do you think could substitute for a finding on shared intent? I wouldn't suggest that they would substitute. I would suggest that they are part of the overall objective evidence that this trial court considered at the time. The three factors that are considered under habitual residence analysis includes whether or not there was a shared intent. And if there was or wasn't, it's not dispositive because you also have to look to see if the child had a geographic change as well as time to acclimate and on the- Well, there's always a geographic change. Correct, I would agree. But nevertheless, it's one of the stated factors. And with- Acclimatization, he filed suit within a year of her not returning the child. Right, but if you're referring to the year time frame, that goes to settlement, which comes under a delay defense under the- You're saying that a three year old child has acclimatized in less than a year to new surroundings? What I'm saying to you is that a three and a half year old child who came to this country, that the trial court made factual findings regarding the fact that the child had acclimatized. That was based upon the fact that the child had been here from the time that she was three and a half years of age, which was secured by both of the parents, that the child had been in school, starting from pre-K to voluntary pre-K through kindergarten, summer camps, religious activities, extensive family and friend networks and socializing, forming the very sort of connections, which is what the courts should look to when they're determining- If those, and I understand we're reviewing for clear errors, so there may not be reversible error on this record. But if you can find acclimatization with a three and a half year old child in less than a year, then you've certainly thrown that factor out the window, because in every one of these cases that will exist. You'll have it in every single one of these cases. Right, but I think what I would add to that though, your honor, is that none of these factors are supposed to be looked at in a vacuum. I know, but you say that about every single factor. Right. You say shared intent, not dispositive, not all that important. They're not dispositive. And then there's a problem with the other one, and you say, eh, not dispositive, not all that important. Well, no, and I would never suggest that any of these- And then geography always occurs, so that one's not all that dispositive and all that important, so where are you left? If I may, your honor, I never said that they're not all that important. What I'm saying to you is that this court has made it clear that you are to look at everything. And when you have the trial court getting two different versions of events and looking to see whether or not the child's relocation, whether or not there had been a shared intent. The trial court made a factual finding that the last shared intent between the parties was for the child to relocate. The father's argument is, of course, that it was all conditioned upon the fact that he was able to get over in the court. There's no case out there that says that all someone has to do is say that it was conditional consent. But here, it's not just a person's word about conditional. There's a document that shows that the consent was conditional. Right, and even that was disputed, and the trial court considered that. What do you mean it was disputed? It was disputed because the father's version of that document was to mean that it guaranteed the child, no matter what, was going to come back to relocate back to Columbia permanently. What did the mother say? The mother's testimony was that she understood the purpose of that document was that if the father's delayed in his application for the travel visa, that the child would go back for a visit. And what did the document on its face say? The document said nothing about the fact that they had applied for the child's habitual residency. What did the document on its face say about return? It had one reference to a date on it. Which said what? Which said for a return a year later. Right. That's explicit. But the trial court made a factual finding with regards to, you have the father testifying to one thing, you have the mother testifying to another. And that document in and of itself, and there's no case law to suggest that a travel consent form is dispositive for determining what the party's shared intent was or was not. And the trial court was presented with two different versions of events with regards to what that meant. And the mother testified that she understood that document to mean that if the father's travel visa hadn't been approved yet by a year, she'd be bringing that child back for a visit. Well, I speak only for myself, and as I said, given the standard of review, there may not be reversible error on this record. But as a matter of general Hague Convention law, it sets a really bad precedent To have parents agree to the return of a child to the country of origin. Have one parent take the child, not return, as the parents had agreed. And then come in with testimony to say, that return document really isn't what it means. And I thought that I could keep the child here, and prevent that document from having any effect. That, to me at least, personally is concerning. And what I would say to that, your honor, is that at the end of the day, that was but one piece of evidence that was presented to the trial court, who sat and listened to the testimony of both the petitioner and the respondent, as well as other witnesses. And this court has made clear to look at all of the objective evidence to determine whether or not the child's habitual residence had shifted, and was based on the evidence that was presented. The father, clearly without doubt, was of the mindset that they weren't broken up until he said they were broken up. And without getting into the societal tentacles that are associated with that, that does tie into setting the tenor of what the evidence was that was presented to the trial court. And there's no case law to suggest that simply because there's a date on the travel form, that that is solely dispositive as to shared intent between the parties. And it's not dispositive. I think that's what she was just saying. Wasn't there also a WhatsApp message where she says that I got you to sign because I lied? No, that was the presentation by the petitioner, and that's not actually what that said at all. I can't recall the specifics of that, but I remember that that was one of the things that came out in trial, and it had been misrepresented. The fact of the matter is, is that the couple had broken up, and the evidence was clear that the father did not want to accept the breakup, and kept trying to get back together, even though the mother repeatedly told him no. And that it's a, quote, because having signed that consent is eating you up. It's eating you up that I lied for you to sign. And not even a lie, because what? We were supposed to be a happy family. Referring to the fact that he kept portraying to everyone back home, and this is consistent with the rest of the evidence that was presented at trial, was that they were supposedly this happy couple, and they weren't. And as I said- But isn't that in the record? Isn't that piece of evidence also in the record? Which part? The message that I just read. Yes, that part is in the record, but that's being taken out of context because that was not the intent of the message. And the lie that she's referring to is the lie that the father had been trying to tell everyone. Anytime they went anywhere, he would continue to try to act like they were a couple. That testimony came out from the mother as well as other people, even though they had heard the type of verbal abuse that he had been doing that led to the breakup, and they were aware of the breakup as well. He would continue to insist, no, we're not breaking up until I say we're broken up. That was in the record as well. I can understand why this case is troubling, obviously for both parties. And especially, I mean, you're handling this pro bono and we as a court, I'm sure I speak on behalf of all of us, really appreciate that. And I can understand why it seems to obviously be very deeply important to you as well. But here's the problem, right? The problem is that we have to decide under the Hague Convention what the shared intent is, the habitual residence, etc. And one of the things we have to determine is whether there was an error on the part of the district court, or whether it even decided in the first place, whether there was a shared intent for the child to permanently relocate to the United States. I mean, I think that's one of the things we have to decide. And if, regardless of whether she may or may not have had a good reason for Then that, I mean, that's something we have to consider, is it not? It would be something they have to consider. But I'd like to go back to one of the comments that you just made in terms of whether or not there was a shared intent to permanently relocate. Because the issue with habitual residences is that even if it's not supposed to be viewed through a lens of permanent relocation so much as agreeing, because clearly parties can end up going and moving somewhere else. It's to look at the last shared intent as to whether or not to abandon a child's habitual residence and take up a new one. And in conjunction with that, they look at the other factors. With regards to the child's habitual residence, they had worked together to secure the child's US permanent residency. Prior to the mother coming back to retrieve the child, she communicated to the father the breakup. His version is different, that's her version, and it's supported by other witnesses and evidence in the book. In terms of whether or not the trial court made a factual finding regarding shared intent, she did. She specifically found that even if the father's version was accepted, that the party's last shared intent was for the child to relocate to the United States. She presented with- What was the timing? Yes, sir. The timing on the application for permanent residency and the conditional permission to travel. Years, because I know the mother's application was submitted by her father in 2000, and she didn't get hers, I don't think, until about 2013 after she got hers is when she applied for her child. And so that was the reason why the child had to stay behind in Columbia, because the child wasn't allowed to come to the United States where her application was pending. What role did the father have in the permanent residency? In terms of securing the green card? Signing for it or agreeing to it? He helped take the, some of the trial court's findings included the fact that the father knew about the process and was helping take the child to the necessary appointment to be able to, it was the final step to secure the US permanent residency. Can I ask you one more question? I know we've taken you beyond your time, but in a case like this where there is a document that in some way, shape, or form talks about the child returning, at what point in time do you measure shared intent? What I would say to you on that is that you have to keep in mind that the testimony with regards to the understanding as to what that date signified was in dispute. I know. So, as far as from the mother's understanding, the child's return was for purposes of a visit. Not for purposes of returning the child back to Columbia. I know what her testimony was, I know what his testimony was. I'm asking you from a court's perspective, at what point in time in a scenario like this, where there's a document that presumes a return for one reason or another. At what point in time along the continuum do you measure shared intent? At the time that the child leaves on a conditional trip, or at the time that the child is supposed to return? I don't know that you measure shared intent that way. One thing that you would measure- You have to measure it at some point in time, because shared intent has to occur at some given point in a time- Right, and there was no shared intent with regards to what the understanding was on that piece of paper. The father's argument is that that piece of paper should be dispositive. That's it. Don't look at anything else. It says a return date. But the problem with that is the competing version of events on it. So as far as for measuring shared intent, you're not going to measure shared intent on that document. No, but if you measure shared intent, are you okay? You want to take a break? If you measure shared intent at a time when the parties agree to have the child taken to a third country, everything is flowers, everything is great, the parties are agreeing, they expect something to happen, maybe in one way or maybe another. Shared intent on that day is going to be very different when everything goes to hell in a hand basket a year later. And the parties are each other's throats. Right. So my question to you is where do you measure shared intent? At what point in time do you say, here, I'm going to pick this date or this range of dates and decide what the parties had a shared intent about? You look back to see the time that they last shared an intent according to, that's the standard. This is that you look back in time. You don't look at the time of the child's removal. You look at the, unless, of course, at that time, that was when they had their last shared intent. But you look back in the record to see where they had their last shared intent. And you consider that against the backdrop of the rest of the objective evidence. And in this one, again, the backbone of the father's argument is that he takes issues with the trial's court's factual finding regarding shared intent. And as your honors already pointed out, that in terms of the factual findings by a trial court, they're to be upheld as long as they are plausible and supported by evidence in the record. And there is conflicting, disputed testimony. The parties do not agree on it. They don't agree as to what the status of their relationship was or how things unfolded. But the trial court made factual findings with regard to shared intent and found that even if she accepted his version of events, which was that that consent document represented an agreed upon date for the child to be returned back to Columbia, that there was still evidence in the record to establish the party's last shared intent was to relocate that child for purposes of having her habitually reside in the United States. And in addition to that, she considered all of the other evidence that was presented to the court to also include the acclimation, which is not disputed on appeal, it's not, they don't address that one on appeal at all. All right, Ms. Crack, thank you very much. Thank you. Ms. Gillette, you have three minutes. Your Honor, the last question about when do you measure the shared intent goes to my superimposition argument. But even if you don't like my particular argument, the facts in this case, in the record, if you'll look at the testimony of Dori Simons, which is an aunt of the respondent, who testified on behalf of the respondent, her testimony was very clear that in December of 2015, one month, or less than one month after the travel consent was signed, my client found out about the boyfriend stateside. And testified, talked to Dori about it, and said he was going to do something about this. This was not, he was duped, and he was not happy about finding out about the boyfriend on Facebook. And that was- You know, but there's also, no one disputes that there's conflicting testimony about a lot of things in this case. But there's also testimony, and it goes to Judge Rosenbaum's question about whether or not the district court made findings. But there is evidence in the record that before the mother left with the child, she told your client, we are done as a couple, and we are not getting married. And that's the only way that I would help you in being able to get residency in the United States. Now, that testimony may not carry the day, it may not be credible, but there is evidence that contradicts the testimony given by the witness you just mentioned. That is correct, your honor. And there's a lot of contradictory evidence in the record, including respondent's testimony that she believed that she was going to go back in 2016 for a visit. Subsequently, as you know, she took the position with our Department of State that she had no intention of ever returning. So there's a lot of conflicting evidence, even evidence put on by the respondent that conflicts with other evidence put on by the respondent. We saw this as some sort of a fraud upon the petitioner. But I did want to briefly touch on the acclimatization argument. I didn't mention much about that in the brief. From a legal analysis standpoint, I've always seen the acclimatization argument as something the court looks to. Once they determine what the shared mutual intent was, you would only look to the acclimatization argument to try to trump the shared parental intent if you've determined what it is. And if there's a disputed parental intent, you would be very slow to infer acclimatization. So I didn't touch on that a lot in the brief. I believe that the acclimatization argument based on the tender age of the child, the fact that she had maternal and paternal family in both locations, the fact she was three and a half habitually resident in Columbia prior to moving, we believe that was a non-issue.  All right, thank you very much, Ms. Gillette. Ms. Frack, we know you were doing this pro bono on behalf of Ms. Lesmas, and we certainly appreciate your service. I didn't know that? Well, our thanks to you as well. We know that both of the parties in this case were not of ample means from the indications in the record. And we certainly could not do our jobs without lawyers like you taking public service and representing them here. So we thank you both very much.